*530 OPINION OF THE COURT
Harold Hyman, J.
This action concerns the entire multiple residential development known as Fresh Meadows (Queens County); it is a large housing complex containing approximately 3,287 apartments in 145 garden-type and highrise buildings. All of the units are subject to the New York City Rent Stabilization Law (Administrative Code of City of New York, § YY51-1.0 et seq., added by Local Laws, 1969, No. 16 of City of New York) and the lessee-lessor-landlord in possession under a long-term lease (hereinafter referred to as the owner) is a member of the Rent Stabilization Association.
The plaintiffs in this action are the "Committee for the Preservation of Fresh Meadows, Inc.” (hereinafter called committee) and some hundreds of individually named persons who ostensibly are members of the said committee and tenants in occupancy of a large number of the apartments.
Plaintiffs bring this action against Fresh Meadows Associates (hereinafter called owner) "on behalf of themselves and on behalf of all other persons similarly situated who are residents of Fresh Meadows”. They allege in the preamble of their complaint that: "the above described class is so numerous that joinder of all members * * * is impracticable” in that the complex contains approximately 3,300 apartments, but that there are questions of law or fact common to the class which predominate over any questions affecting only individual members; that the claims of plaintiffs are typical of the claims of the class, and that the plaintiffs will fairly and adequately protect the interests of the class so that a "class action” is superior to other available methods for the fair and efficient adjudication of the controversy; and, that, from the time defendant became the landlord in 1972 and continuing to date, the defendant (owner) has failed to provide adequate janitorial maintenance, repair maintenance, lawn and ground maintenance, vermin extermination services and painting throughout the complex and, therefore, they allege as their three causes, (1) that due to defendant’s failure to provide the leased premises of plaintiffs with adequate services, and all areas used in common by them and the rest of the class, said premises have become unfit for human habitation or for the use reasonably intended by the parties, and that the entire class has been subjected to dangerous, hazardous, detrimental to life, health and safety conditions for which they seek *531 $1,000,000 in damages; and (2) that defendant commenced a course of conduct severely reducing the number of its maintenance staff in deliberate violation of the New York City Rent Stabilization Law and to a level insufficient to proper maintenance of the premises and to a level required by the Rent Stabilization Law for which they also seek damages in the additional amount of $1,000,000; and (3) that defendant, owner, by its willful and deliberate refusal to comply with the law and to provide the said "services” heretofore mentioned, that defendant is guilty of negligence per se, for which they are entitled to damages in the amount of $1,000,000; and (4) they seek attorneys’ fees.
The defendant, owner, denies the material allegations of the complaint and asserts certain affirmative defenses, only three of which, the fourth, which alleges that the apartments are all subject to the Rent Stabilization Law, a police power statute, and therefore section 235-b of the Real Property Law is inapplicable; the sixth which alleges that a class action status is not available herein; and the eighth which alleges that a prior action is pending which embraces the claims made in the instant suit.
The present motion is made by defendant pursuant to CPLR 3212 for summary judgment contending that as a matter of law the complaint is insufficient; or alternatively for a "stay” of this action pending determination of the appeal in the other "prior” action.
Although this motion is brought pursuant to CPLR 3212, for summary judgment, neither of the parties’ affirmations, plaintiffs’ or defendant’s, have been made by "a person having knowledge of the facts” a requirement of the statute (CPLR 3212, subd [b]), but rather by their respective attorneys and as such neither affidavit is made with factual knowledge and therefore cannot afford a basis for granting summary judgment since they have no probative value (Chickering v Colonial Life Ins. Co. of Amer., 51 AD2d 566; Rosemont Enterprises v Choppy Prods., 74 Misc 2d 1003). Nevertheless, and since both parties have seen fit to consider the motion as being one "to dismiss the complaint for failure to state a cause of action” made pursuant to CPLR 3211 (subd [a], par 7), and also CPLR 3211 (subd [a], par 4), that there is another action pending, the court will consider the motion accordingly and will consider the attorneys’ affirmations as part of their respective memoranda of law.
*532 Concededly most all of the plaintiffs are tenants pursuant to written leases (defendant denies that some seven of them are not) out of which allegedly emanates their third cause of action wherein they contend that their common areas have become unfit for human habitation or use reasonably intended by the parties and that such has been occasioned by the "willful and deliberate refusal of defendant to comply with the law to provide proper services and maintenance.” Plaintiffs contend such to be "negligence per se.”
Although the action, if any there be, is labeled by plaintiffs as being one in negligence, it obviously is based upon section 235-b of the Real Property Law, that is, upon a breach of expressed or implied warranties of the leasehold or rental agreement, contractual or statutory, tenancies; it is therefore one in breach of said tenancy status. The alleged "wilfull and deliberate” violation of the terms, written or implied, of said lease or tenancy status, nevertheless does not give rise to a cause of action for civil liability (New York City Housing Auth. v Medlin, 57 Misc 2d 145; Real Property Law, § 235); nor is the court empowered to imply such a civil cause of action (New York City Housing Auth. v Medlin, supra); certainly not as to a statutory tenancy which is protected, as to the tenant’s rights, through the administrative machinery supplied under the statute involved (Barbee v 2639 Corp., 284 App Div 298).
The first cause of action speaks similarly, virtually identical to that of the third cause of action, except that it does not charge defendant’s acts to be "wilfull and deliberate” or "negligent.” It charges such acts to have been occasioned by the defendant "[F]rom the time that defendant became landlord * * * in 1972, and continuing to date”. Ostensibly the plaintiffs believe they come within the purview of section 235-b of the Real Property Law (warrant of habitability), a statute which was legislatively enacted by chapter 597 of the Laws of 1975 (eff Aug. 1, 1975).
In approving the enactment afore-mentioned, the Governor, in part, states: "The bill represents a signiñeant beneñeial change in the law of landlord and tenant. * * * In the absence of an express provision in the lease, the landlord is not obligated to make necessary repairs. To a very large extent, the doctrine of caveat lessee still prevails and requires a tenant to take the premises as they are and assume all risks *533 as to their condition.” (NY Legis Ann, 1975, pp 437-438; italics added.)
It has been held that this enactment creating an implied warranty on the part of the landlord, may not be applied retroactively to an alleged cause of action arising prior to August 1, 1975 (Francais v Cusa Bros. Enterprises, 53 AD2d 24) and, it also has been held that, since it was substantive law and not declarative of common law, it could not. be applied retroactively to disputes arising between a landlord and tenant prior to August 1, 1975 (Kaplan v Coulston, 85 Misc 2d 745; Francais v Cusa Bros. Enterprises, supra; People v Oliver, 1 NY2d 152; Addiss v Selig, 264 NY 274; McKinney’s Cons Laws of NY, Book 1, Statutes, § 53). As a matter of fact, in their memorandum of law submitted to this court, plaintiffs concede that their reliance upon the statute as to matters predating the effective date of the statute (Aug. 1, 1975) is not well grounded. In any event, section 235-b of the Real Property Law may not be considered to be read into the leases of any plaintiffs whose tenancies commenced prior to August 1, 1975, or are of a mere statutory status resulting from a lease existing prior to said date (Barbee v 2639 Corp., 284 App Div 298, supra).
Since the complaint does not specifically allege which tenancies existed or were created prior to August 1,1975, nor which came into being subsequent to that date, and also, since this court does not agree with plaintiffs’ contention that any common-law right existed prior to the statute (Real Property Law, § 235-b), as to those tenants with tenancies created prior to August 1, 1975, no cause of action is stated.
As to those tenancies created subsequent to August 1, 1975 due to a vacancy occurring, another direction must be pursued.
On May 6, 1969, by Local Law No. 16, New York City enacted a New York City Rent Stabilization Law (Administrative Code of City of New York, §§ YY51-1.0 — YY51-7.0), based upon a serious emergency situation involving and concerning the exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices threatening public health, safety and general welfare. It was, of course, enacted pursuant to governmental police powers long recognized as constitutionally viable. One of its purposes was to, in some manner, take under its control, housing accommodations in multiple dwell *534 ings which were then not subject to the New York City Rent and Rehabilitation Law as it then existed.
As part of said legislation it provided for the setting up, and the approval of a Real Estate Industry Stabilization Association with a Conciliation and Appeals Board (CAB) wherein each member is required to agree in writing to comply with the code and to abide by order of CAB; and, for the association to be able to carry out the purposes of legislation; and, that the code not be approved unless it be acceptable to the Housing and Development Administration that such code, among other provisions, provide safeguards which require members of the association to maintain all services furnished by them on May 31, 1968; and, to specifically provide that if a member fails to comply with any order of CAB he shall not be deemed a member in "good standing”, and that he be appropriately disciplined by sanction as fine or censure (Administrative Code, § YY51-6.0). That industry did set up such a Code of the Real Estate Industry Stabilization Association of New York City, Inc. (code), which was duly accepted and approved by the Housing and Development Administration.
Among other matters, the code section mandates that the owner-landlord provide: "2(m) Required Services: That space and those services which were furnished or were required to be furnished for the dwelling unit on May 31, 1968”, and section 7 of the code provides that "[A] member shall forfeit his status as a member in 'good standing’ and shall have his membership with respect to the entire building or any building unit suspended or terminated pursuant to an order of CAB, in the event said board determines (b) that he has refused to abide by an order of said CAB within ten days of the date of the issuance of such order,” and, further, in section 33, it provides "[T]he CAB shall receive and act upon complaints from tenants”.
By said code, CAB was granted certain general powers and also certain specific duties. Subdivision (b) of section 34 lists one of the latter; it provides for "[T]he determination of any claim of violation against any member requiring suspension or other discipline pursuant to sections 7 and 8 of this Code.”
Needless to say that the ability to obtain or be entitled to any upward adjustment of rents definitively depends upon membership "in good standing” in such prescribed type of association or as allowed under subdivision d of section YY515.0 of the Administrative Code; and, although membership by *535 owners of multiple dwellings in the association is voluntary, an owner who does not join an approved association has his dwelling(s) become subject to normal rent control under title Y of chapter 51 of the Administrative Code, enacted by the city in 1962, in which case the City Rent Agency shall establish the maximum rent on the basis of the rent charged on May 31, 1968 (Administrative Code, § YY51-4.0; 8200 Realty Corp. v Lindsay, 27 NY2d 124, 131, app dsmd 400 US 962; Matter of Windsor Park Tenants’ Assn. v New York City Conciliation & Appeals Bd., 59 AD2d 121, 125).
As stated in the latter two cases, "[I]t is thus to be seen that members of the industry play a part closely interrelated with official agencies in rent control by mechanisms designed to protect both owners and tenants during the emergency. The over-all supervision of the regulatory process is vested in the Housing and Development Administration which is expressly authorized to enact rules and regulations for the implementation of the statute (§ YY51-4.0, subd c); to approve the code of an association (§ YY51-6.0, subd b, par [2]), and to discipline an association (subd d).” (Emphasis supplied.)
Pursuant to section 17 of chapter 576 of the Laws of 1974 (eff May 29, 1974), section YY51-6.0.3 ("Maintenance of services”) was added to the New York City Administrative Code; it, in part, provides: "In addition to any other remedy afforded by law, any tenant may apply to the conciliation and appeals board for a reduction in the rent to the level in effect prior to its most recent adjustment and the conciliation and appeals board may so reduce the rent if it finds that the owner has failed to maintain such services.” Absent such provision the owner being held in violation of the Rent Stabilization Law, and the code, could be declared "not in good standing” and therefore his premises subject to title Y, which in turn had the authority itself to reduce the rent accordingly.
It is therefore apparent that until the enactment of section 235-b of the Real Property Law, tenants such as these plaintiffs purport to be, had only certain alternatives, to either pay their rent or be summarily dispossessed, or apply to CAB for rent reductions for the owner’s failure to maintain services. In neither case were tenants granted any independent or common-law right of action to seek damages. No such right was created for them by either the Rent Stabilization Law or section 235-b of the Real Property Law (eff Aug., 1975), where the owner (defendant herein) is a member of the association *536 and is subject to the code, subject to fine, and subject to the orders of CAB and thereupon also possibly subject to the penalties ultimately allowable under the rules of the Housing and Development Administration upon termination or suspension of his membership.
Truly the rent control statutes, of which the Rent Stabilization Law is one, were constitutional enactments under governmental police powers. Without such legislation the owner-landlord had carte blanche right to conclude any new tenancy agreement following a tenancy which terminated by the terms of the lease or holdover status.
By virtue of the afore-mentioned emergency rent laws such right has been virtually removed from a landlord-owner, who must now accept the holdover or new tenant as a statutory tenant and, if he seeks an increase in rent, is limited by subdivision d of section YY51-5.0 or must make application to the administrative agency therefor. A "holdover” tenant’s right to remain in occupancy is one created by statute in derogation of the common law; it most certainly is not a right created by contract between the parties. As stated by Mr. Justice Breitel (then in the Appellate Division and now Chief Judge of the Court of Appeals) in Barbee v 2639 Corp. (284 App Div 298, 300-301, supra), "As statutory tenants, plaintiffs’ rights do not derive from contract, but exist by reason of the emergency statutes which assure their rights to occupancy. The terms of expired leases are, pro tanto, projected for the duration of such occupancy and for the period of the emergency (Wasservogel v. Meyerowitz, 300 N. Y. 125; Stern v. Equitable Trust Co., 238 N. Y. 267; Penfield v. Murray Hill Holding Corp., 211 App. Div. 675, affd. 306 N. Y. 602; Fireman v. Newcraft Associates, 200 Misc. 894 [Special Term, N. Y. Co.]. Consequently, tenants have no cause of action based on contract. Insofar as the incidents and appurtenances of their occupancy, including essential services, are projected by virtue of the statute, those statutory rights are protected through the administrative machinery supplied under the statute (State Residential Rent Law; L. 1946, ch. 274, as amd.). Involved in the administration of the emergency statute is the maintenance, on the one hand, of rent levels for controlled housing, and on the other hand, the maintenance of essential services. Both branches of regulation reside in the administrative agency and, to the extent that the remedies available are reasonably adequate, that jurisdiction is exclusive (Brownrigg *537 v. Herk Estates, 276 App. Div. 566).” The situation is no different as to a new tenant in rent stabilized housing.
There is no question that defendant, as a member of the association, was subject to a penalty for failure to maintain services, not merely to a rent reduction, but now also to pay reasonable costs, reasonable attorneys’ fees, and an additional penalty up to $250 (§ YY51-6.0.3, eff May 29, 1974).
In addition to the foregoing, sections YY51-3.0 and YY513.1, as originally enacted in 1969, included therein defendant’s premises; they were similarly included in the 1974 amendment; as such they were "deemed to be housing accommodations subject to control under the provisions of title Y of chapter fifty-one of the administrative code * * * unless the owner of such units is a member in good standing of any association registered with the housing and development administration pursuant to section YY51-6.0 or section YY51-6.1. For the purposes of this law a 'member in good standing’ of such association shall mean an owner of a housing accommodation subject to this law * * * and further provided * * * does not violate any order of the conciliation and appeals board” (§ YY51-4.0, subd a). It therefore follows that upon a finding by CAB that an owner violated the code by not supplying required maintenance or service, he could be declared "[N]ot in good standing”, his premises thereupon deemed under city rent control laws with the attendant liability to rent reduction, and such other penalty allowable by that statute.
This court has no doubt about the emergency rent laws, all being parallel and, at the same time, intertwining with one another in the over-all legislative intent to protect the general public from the emergency declared caused by rent gouging so as to provide for a new tenant, or a statutory "old” tenant remaining in occupancy, without paying what the Housing and Development Association or CAB deems exorbitant, but only a fair rent (Rent Stabilization Law, § YY51-5.0, subd d).
It was never the legislative intent to permit every tenant who had an alleged claim for reduced services or maintenance to litigate his action in the courts and not be required to proceed through the prescribed administrative agency process, whether it be the "old” (statutory) tenant or the new, and also statutory tenant of housing controlled by the emergency rent laws (Rent Stabilization Law, § YY51-5.0, subd d). To assume otherwise would have had to bring the courts and their *538 personnel, each and all of them, into complete chaos. It would have resulted in such chaos by the very number of cases which would have been brought and the inability of courts or court personnel to handle or adjudicate on such number. Truly no such objective was legislatively intended or sought; it just could not be, or it could not have been accomplished.
The court does not find that section 235-b of the Real Property Law was meant to supersede or grant parallel rights to that of the administrative agency, its duties or rights provided fully by the rent laws in the Legislature’s desire to expedite the claims of tenants or rights of the landlord. Tenants who are subject to the city rent laws or Rent Stabilization Law must make their claims to the proper administrative agency for they do not have any independent right to litigate same in the courts, nor has any such right been created as to them.
The first cause of action is therefore dismissed.
As to the second cause of action, wherein plaintiffs seek damages resulting from defendant’s alleged deliberate violation of the Rent Stabilization Law, no such independent cause of action has been created or provided for by the Rent Stabilization Law; the statute provides its own penalties in the event of violation (New York City Housing Auth. v Medlin, 57 Misc 2d 145, supra); it does not create any independent civil cause.
The alleged second cause of action is likewise dismissed.
In view of the foregoing, and since both plaintiffs and defendant have apparently briefed their respective positions in full and in detail, and since plaintiffs have not sought leave to replead, the court is satisfied that plaintiffs do not have any legal cause or basis of action or need for repleading, leave to replead is not granted (CPLR 3211, subd [e]).
The motion of defendant dismissing the three causes of action for legal insufficiency pursuant to CPLR 3211 (subd [a], par 7) renders unnecessary consideration of the issue on the basis of CPLR 3211 (subd [a], par 4) "another action pending.”
Défendant is hereby granted motion costs of $40 (CPLR 8202) in addition to statutory costs pursuant to CPLR 8201.